CAPE PUBLICATIONS, INC. d/b/a The Courier–Journal, Appellant,

v.

UNIVERSITY OF LOUISVILLE FOUNDATION, INC., Appellee.

No. 2005–SC–000454–DG.

Supreme Court of Kentucky.

Aug. 21, 2008.

Jon L. Fleischaker, Robert Kenyon Meyer, Jeremy Stuart Rogers, Dinsmore & Shohl, LLP, Louisville, KY, Counsel for Appellant.

T. Kennedy Helm, III, Michael D. Risley, Stites & Harbison, PLLC, Louisville, KY, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

Appellant, Cape Publications, Inc., d/b/a The Courier–Journal (Courier–Journal), appeals a decision of the Court of Appeals denying an open records request directed to Appellee, University of Louisville Foundation, Inc. (the Foundation). This Court granted discretionary review to determine whether the Courier–Journal has a right to access records of donations made to the Foundation under Kentucky's Open Records Act. For the reasons set forth herein, the decision of the Court of Appeals is affirmed in part and reversed in part.

## I. Background

In April of 2001, the Courier–Journal made an open records request of the Foundation, a fundraising arm of the University of Louisville. The Courier–Journal sought disclosure of the identities of certain donors and the amounts of such donations. The Foundation rejected the request, claiming that it is a private corporation not subject to Kentucky's Open Records Act, KRS 61.870 *et seq.* The Foundation also rejected the request on the grounds that it would be an unwarranted invasion of the personal privacy of each of these donors. The Courier–Journal filed suit in the Jefferson Circuit Court pursuant to KRS 61.882.

Following cross-motions for summary judgment, the Jefferson Circuit Court entered two orders. In the first order, the

court held that the Foundation is a public agency as defined by KRS 61.870 and that corporate and private foundation donor records are not exempt under the personal privacy exemption. The Foundation disagreed and appealed that portion of the order which declared it a public agency. However, the Court of Appeals affirmed. As to the applicability of the personal privacy exception to corporate donors, the Court of Appeals remanded the issue to the trial court for further fact-finding regarding the specific circumstances of the donations. The Foundation's subsequent motion to this Court for discretionary review was denied.

During the pendency of the appeal, the parties continued to litigate the issue of whether the personal privacy exemption applies to individual donors. The Courier–Journal sought disclosure of approximately 47,000 individual donors who had not previously been publicized. Of these 47,000 donors, 62 specifically requested that their donations remain anonymous. By the second order, the trial court held that only the names of the individual donors requesting anonymity were protected by the personal privacy exemption. Both parties appealed.

The Court of Appeals affirmed in part and reversed in part, finding the donors' interests in personal privacy superior to the public's interest in disclosure. Thus, the Court of Appeals determined that the Foundation could withhold the identities of all donors, not simply those requesting anonymity. The Courier–Journal sought discretionary review before this Court, which was granted.

## II. Analysis

■ Kentucky's Open Records Act, KRS 61.871 *et seq.*, seeks to ensure the free and open examination of public records. This statute, however, is not without its limits. KRS 61.878 sets forth certain types of documents that are exempt from public inspection absent a valid court order. Included within this exemption are "public records containing information of a personal nature where the public disclosure thereof would constitute a *clearly unwarranted invasion of personal privacy.*" KRS 61.878(1)(a) (emphasis added). This exception reflects our society's recognition that "privacy remains a basic right of the sovereign people[.]" *Board of Educ. v. Lexington–Fayette Urban County Human Rights Comm'n,* 625 S.W.2d 109, 110 (Ky. App.1981).

■ Accordingly, we must apply a two-part test to determine whether the Courier–Journal may compel disclosure of the Foundation donors. First, we must determine whether the information sought is of a personal nature. Second, we must examine whether the public disclosure of this information would constitute a "clearly unwarranted invasion of personal privacy." We do this by weighing the privacy interests of the persons involved against the public's interest in disclosure. *Kentucky Bd. of Exam'rs of Psychologists v. Courier–Journal & Louisville Times Co.,* 826 S.W.2d 324, 327–28 (Ky.1992). Because this inquiry involves a question strictly of law, our review is de novo. *Hardin County Schs. v. Foster,* 40 S.W.3d 865, 868 (Ky.2001).

### A. Nature of the Information

■ Turning to the first prong of our inquiry, we must take into account "the nature of the information which is the subject of the requested disclosure; whether it is the type of information about which the public would have little or no legitimate interest but which would likely cause serious personal embarrassment or humiliation." *Palmer v. Driggers,* 60 S.W.3d 591, 598 (Ky.App.2001). We con-

sider not only the privacy interests of the parties to the Open Records request, but also of persons who would be substantially affected by the disclosure. *Beckham v. Board of Educ. of Jefferson County*, 873 S.W.2d 575, 578 (Ky.1994). We look for an indication that the information "touches upon the personal features of private lives." *Zink v. Dep't of Workers' Claims*, 902 S.W.2d 825, 828 (Ky.App.1994).

■ Here, the Courier–Journal seeks the identity of each donor to the Foundation, that person's address, the amount of the donation, and any conditions placed upon the gift. We have previously noted that one's "home address and telephone number are generally accepted by society as details in which an individual has at least some expectation of privacy[,]" notwithstanding that this information is normally available to the public through other sources. *Zink, id.* at 828. Even more private is the amount of the donation and the circumstances under which the gift was made. It is a widely held societal belief that matters of personal finance are intensely private and closely guarded. *Zink, id.* at 829. ("[F]ew things in our society are deemed of a more intimate nature than one's income."). Though not as intimate as one's income, the decision to make a charitable gift, the amount of that gift, and its destination, is nonetheless a personal choice of a private nature. Undoubtedly, the information sought by the Courier–Journal in this matter is of a "personal nature."

### B. Public Interest in Disclosure

■ Having determined that the information is indeed "of a personal nature," we turn to the more complex question of whether disclosure of this information would constitute a clearly unwarranted invasion of personal privacy. We have previously explained that this inquiry "entails a 'comparative weighing of antagonistic interests' in which the privacy interest in nondisclosure is balanced against the general rule of inspection and its underlying policy of openness for the public good." *Zink. id.* at 828, citing *Board of Exam'rs, id.* at 327. Thus, the individual donor's privacy interest must be weighed against the public's interest in disclosure of the donor's identity.

■ The stated goal of the Open Records Act is to ensure the "free and open examination of public records." KRS 61.871. "[I]nspection of records may reveal whether the public servants are indeed serving the public, and the policy of disclosure provides impetus for an agency steadfastly to pursue the public good." *Board of Exam'rs. id.* at 328. Still, this Court has acknowledged that "the policy of disclosure is purposed to subserve the public interest, not to satisfy the public's curiosity." *Id.*

The public has a legitimate interest in the functions of the Foundation. As noted above, the Court of Appeals determined that the Foundation is a public agency within the meaning of the Open Records Act, and that ruling has not been disturbed by this Court. The Court of Appeals' conclusion was predicated on the finding that the Foundation and the University essentially act as one and the same, and that the Foundation was established, created, and wholly controlled by the University. As a public institution that receives taxpayer dollars, the public certainly has an interest in the operation and administration of the University. KRS 164.810 *et seq. See also Courier–Journal & Louisville Times Co. v. Peers*, 747 S.W.2d 125, 130 (Ky.1988) (disclosure of requested documents was required primarily because the information concerned "the expenditure of public funds"). The Foundation's stated goal is to advance the charitable and educational

purposes of the University of Louisville. To this end, it solicits, receives, and spends money and other assets on behalf of the University. The public's legitimate interest in the University's operations then logically extends to the operations of the Foundation.

Moreover, the Courier–Journal has argued, and we agree, that certain donors may not simply wish to conceal their identities, but rather may wish to conceal the true purposes of their donations. Donors, particularly those making substantial gifts, may wish to influence the University's decisions and policies, or to have some type of benefit conferred upon them by the University. The record supports this contention—several anonymous donors specifically indicated that their gifts were being made with the understanding that they would receive tickets to athletic functions. Accordingly, we agree that the public's interest is particularly piqued by large donations from anonymous donors, and that a legitimate question of influence is raised by such circumstances.

### C. Privacy Interests at Stake

We now turn to the privacy interests of the Foundation's donors. It is here that a distinction must be drawn between those donors who requested anonymity and those who did not. Of the 47,000 donors to the Foundation whose identities have not previously been publicized, 62 specifically requested that their identities be withheld. Many of these 62 persons demonstrated their desire for anonymity by checking a box on the Foundation's donor form which specifically asks whether the donation is "anonymous." Others directly asked the Foundation to withhold their identities. Five requested anonymity verbally.

#### 1. *Non–Anonymous Donors*

■ We agree with the trial court's conclusion that the privacy interests of those donors not requesting anonymity are minimal. It is commonplace that a charity or other organization collecting donations will publish a list of donors and sponsors as a way of recognizing those persons and advertising the success of its fundraising efforts. In fact, for some persons, the fact that his or her name will be included in a publicized list is itself an incentive to make a donation or gift to the organization. We are not persuaded that this set of donors held a legitimate expectation of privacy in their donations.

When balanced against the public's interest in disclosure, the privacy interests of the non-anonymous donors do not outweigh the need for public disclosure of these donors' identities. We agree with the trial court that the non-anonymous donors had a very minimal expectation of privacy in making the donations. Moreover, though personal in nature, the information sought by the Courier–Journal does not involve the revelation of intensely private information, such as personal income or medical history. The public, on the other hand, has a legitimate interest in the amounts and sources of monies donated to the Foundation, which ultimately fund the University. Particularly, in light of the donors' lowered expectations of privacy in this circumstance, we do not believe that disclosure of these non-anonymous donors' identities would constitute a "clearly unwarranted invasion of personal privacy" within the meaning of the Open Records Act. Therefore, we reverse the Court of Appeals as to the group of donors not seeking anonymity.

#### 2. *Anonymous Donors*

■ The 62 donors who requested anonymity, however, are positioned differently than the remaining donors. At the time of each of these anonymous donations, the

status of the Foundation was unclear. The Court of Appeals had not yet determined that the Foundation was a public entity for purposes of the Open Records Act. In fact, at the time these donations were made, the Foundation's status had only been considered within the context of Kentucky's Open Meetings Act, KRS 61.800 *et seq.* In *Courier–Journal and Louisville Times Company v. University of Louisville Board of Trustees*, the Court of Appeals concluded that the Foundation was not a public entity as defined in KRS 61.805(2). 596 S.W.2d 374, 376 (Ky.App.1979). It is also important to note a 1986 Opinion of the Attorney General, which evaluated the privacy interests of donors who had made contributions directly to the University. Ky. OAG 86–76. The Attorney General concluded that such donations fell within the privacy exception set forth in KRS 61.878.

As the Foundation's status as a public entity was not clearly established prior to the Court of Appeals' decision in this case, it was certainly reasonable for each donor to believe that the donation was being made to a private entity. Furthermore, the donors were specifically asked whether their donations were to be anonymous. In fact, the record reveals that a promise of anonymity was a condition of certain donors' gifts. When an organization gives a donor the option of anonymity, it is certainly natural to assume that the recipient actually have the ability to honor the request. More importantly, when persons make anonymous donations to a private entity, it is not expected that the donors' identities and details of the gifts will be made available to the public. For these reasons, the anonymous donors' expectations of privacy were heightened, and the disclosure of their identities constituted a clearly unwarranted invasion of personal privacy.

When weighed against the public's interest in the source of Foundation funds—and ultimately, University funds—we conclude that the anonymous donors' interests in privacy are superior in this instance. Moreover, we note that there is no evidence in the record that would heighten the public's interest in disclosure of the anonymous donors' identities or otherwise affect this conclusion. The trial court conducted an *in camera* review of the 62 anonymous donors, including additional information concerning the circumstances of the gifts, and considered arguments by the Courier–Journal favoring disclosure. The trial court found nothing in the sealed records that would heighten the public's interest in the identities of these donors. Following our review of the sealed documents, we reach the same conclusion. Simply put, the arguments propounded by the Courier–Journal do not create a compelling enough public interest in the circumstances of the anonymous gifts to warrant disclosure of these donors' identities. Thus, we affirm the Court of Appeals as to the 62 donors seeking anonymity.

However, we must emphasize that our holding with respect to the anonymous donors turns primarily on the fact that each donor believed, at the time of the gift, that the donation was being made to a private entity. By virtue of the Court of Appeals' opinion, future donors to the Foundation are aware, and on notice, that their gifts are being made to a public institution and, therefore, are subject to disclosure regardless of any requests for anonymity.

In summary, this Court holds that the names of the Foundation donors are subject to the disclosure requirement of KRS 61.871. Excepted, however, are those 62 persons who requested anonymity and who made donations to the Foundation prior to it being declared a public entity. Accord-

ingly, we reverse the Court of Appeals in part and hereby reinstate the order of the Jefferson Circuit Court.

NOBLE, J., and Special Justices, F. KENNETH CONLIFFE and DAVID V. KRAMER, concur. MINTON, C.J., concurs in part because he agrees with the majority's conclusion that the donors who did not request anonymity should not receive it; but he dissents from the majority's conclusion that any donors should receive anonymity because his examination of the law has caused him to conclude that there cannot be an anonymous donation to a public institution. SCOTT, J., concurs in part and dissents in part by separate opinion. VENTERS, J., not sitting.

Concurring in part and Dissenting in part Opinion by Justice SCOTT.

While I concur with most of the majority's opinion, I respectfully dissent from the opinion's lately added "dicta" that *in the future* all donors to the Commonwealth's public institutions of higher education will be denied the right to privacy regarding charitable gifts, even if they request anonymity. This court simply does not have the right to pronounce decisions for future courts, or Attorney Generals, *on facts that are not before us.* Especially one founded on such an unwise policy.

Consider for example:

In an age where the names of wealthy philanthropists adorn buildings on college campuses and are routinely plastered on everything from orchestra programs to park benches, it's worth noting that many givers take pains to avoid recognition for everything from religious reasons to fear of being deluged with additional requests for donations.

Todd Wallack, *Why Some Big–Time Donors Like to Stay Under Wraps; When*

*Discretion is the Better Part of Philanthrophy,* S.F. Chron., Dec. 17, 2006, at 11.

An integral part of the operation of any university or college is the school's efforts to raise funds and secure donations. Perhaps some persons enjoy whatever publicity they receive as the result of their donations. However, other persons or organizations prefer that their efforts and consideration to donations be kept confidential. This may be particularly true in the case of those making or considering the making of large donations since if this becomes known, generally, they may be contacted and pressured by many other organizations seeking donations. Thus, the expectation of privacy of the donors or potential donors in this particular situation is of importance.

. . . .

Therefore, it is the opinion of the Attorney General that the University's refusal to release the names of the donors and potential donors on whose behalf the University expended money in connection with University fund raising efforts can be supported by the privacy exception set forth in KRS 61.878(1)(a) of the open Records Act. . . .

Ky. OAG 86–76.

Moreover, the "purpose [of the Open Records Act] is not fostered ... by disclosure of information about private citizens that is accumulated in ... government files that reveals little or nothing about an agency's own conduct." *Zink v. Com., Dept. of Workers' Claims, Labor Cabinet,* 902 S.W.2d 825, 829 (Ky.App.1994). And, as has been noted in *Zink,* 902 S.W.2d at 828 and *Hines v. Com., Dept. of Treasury,* 41 S.W.3d 872, 875 (Ky.App.2001), if this information is open to one it is open to all, inviting unwanted attention and, as here, unwanted intrusion.

So what public interest could we possibly serve by thumbing our noses at potential wealthy donors who simply will not give if they have to suffer an aftermath of harassment by professional fundraisers? "Benevolent individuals who choose to give should not have their generosity punished with unwanted telephone appeals and inundated mailboxes." Bruce Mohl, *Most Charities Sell Names of Donors; Nonprofits Also Swap Lists to Raise Funds, Watchdog Group Says,* The Boston Globe, Dec. 2, 2004, at E1. Also consider, that every court that has reviewed the question of anonymity for the sixty-two donors that requested it here, *including the sealed records,* found nothing of interest, or that would benefit, the public good as envisioned by the Open Records Act. As to those that would seek to abuse the process of giving, they would be caught and disclosed anyway in all situations such as this by the Court's *in camera* review, which was surely appropriate here. KRS 61.882(3).

At a time when the cost of education is rising, including public tuition, we should be seeking more financial help for those who cannot afford an education, not turning it away with an "I don't care" attitude. So just what are we achieving by suggesting that anonymity will be denied in all future cases? Nothing—but hurting Kentucky's children.

Yet hopefully, however, those wealthy donors that are fearful of the future status of anonymity will still give—just maybe to private colleges. Yet, I hate to see our good public institutions put to such a disadvantage without good reason. Thus, I must strongly dissent to the revocation of anonymity forecasted by the fearful "dicta" of the majority's opinion.